# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

GEORGE CLINTON,

     Plaintiff,               Case No.

v.                         Hon. _____

UMG RECORDINGS, INC.,

     Defendant.

---

SCHENK & BRUETSCH PLC
James P. Allen, Sr. (P52885)
Peter E. Doyle (P81815)
211 W. Fort Street, Suite 1410
Detroit, MI 48226
(313) 774-1000
james.allen@sbdetroit.com
peter.doyle@sbdetroit.com

THE SCHARF APPELLATE GROUP
Erik W. Scharf
1395 Brickell Ave., Ste. 800
Miami, FL 33131
(786) 382-7611
erik@appealsgroup.com
*Attorneys for Plaintiffs*

---

# COMPLAINT

Plaintiff George Clinton ("Clinton"), by and through his attorneys, brings this Complaint against Defendant UMG Recordings, Inc. ("UMG"), and alleges as follows:

## NATURE OF THE ACTION

1.      This is a straightforward breach of contract case arising from UMG's decision to withhold **100% of royalties** payable to Plaintiff under governing recording agreements based on a third-party lawsuit to which UMG is not a party, in which UMG faces no claim, in which UMG could incur no liability, and in which the third party has now lost on summary judgment.

2.      Defendant purports to justify its conduct based on the *Estate of George Bernard Worrell, Jr. v. Thang, Inc. and George Clinton*, Case No. 4:22-cv-11009-FKB-DRG, previously pending in the United States District Court for the Eastern District of Michigan and now on appeal to the United States Court of Appeals for the Sixth Circuit (the "Worrell Litigation").

3.      In the Worrell Litigation, the Estate of George Bernard Worrell, Jr. (the "Estate") sued Clinton and his company Thang, Inc., seeking a declaration that Bernie Worrell was a **50% co-owner** of certain sound recordings.

4.      UMG was named as a defendant in the Worrell Litigation only "in an abundance of caution." On October 20, 2023, the Court dismissed Defendant and all other music-company defendants from the case. Defendant has not been a party to that litigation for over two and a half years.

5.      On September 4, 2025, the District Court granted summary judgment in favor of Clinton and Thang, Inc. The Court ruled that all the Estate's claims were

time-barred under the Copyright Act's statute of limitations. The Court further noted that the Estate had no "plausible" theory for ownership claims of any sound recording made before 1976.

6.     Despite (i) UMG's dismissal from the Worrell Litigation as a non-necessary party, (ii) the District Court's summary judgment in Clinton's favor, (iii) the Estate's express limitation of its claim to a 50% co-ownership interest, and (iv) the Estate's admission that it has no claim to royalties from recordings unconnected to Bernie Worrell, UMG continues to withhold **100%** of royalties from Plaintiff across *every* royalty account, including accounts for sound recordings that have no factual or legal nexus whatsoever to the Worrell Litigation.

7.     UMG's conduct is not authorized by the parties' agreements (Note the governing contract was produced in the *Worrell* litigation and marked "confidential" by UMG. It is not attached here as an exhibit but it is in Defendant's possession.) The governing contract permits UMG to withhold only such amounts "as may be reasonably necessary, in [its] judgment, to protect [it] and as are related to the potential liability in issue." UMG faces no claim, no demand, no judgment, and no potential liability in the Worrell Litigation. The amount UMG is withholding bears no rational relationship to any "potential liability in issue." Indeed, no such potential liability exists at all.

8.    As of the most recent quarterly statements (period ended December 31, 2025), UMG is withholding royalties in excess of **$1.1 million** from Clinton. These funds have been frozen for more than three years, with no legal justification, financially crippling Plaintiff.

## PARTIES

9.    Plaintiff George Clinton ("Clinton") is an individual residing in the State of Florida. Clinton is a recording artist, songwriter, and bandleader who has performed professionally as a member and frontman of the group "Parliament," among others, since the 1960s. Clinton regularly conducts business in the Eastern District of Michigan and is the named defendant-appellee in the Worrell Litigation.

10.    Defendant UMG Recordings, Inc. ("UMG") is a Delaware corporation with its principal place of business in California. UMG does business nationwide, including in the Eastern District of Michigan. UMG is the successor-in-interest to Casablanca Record and Filmworks, Inc. ("Casablanca"), the original contracting party to the 1980 Agreement defined below, and also administers the EMI/Capitol Records catalog and the Mercury/Island catalog, through which various of Plaintiff's royalty accounts are paid.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     This Court has personal jurisdiction over UMG. UMG has continuous and systematic contacts with Michigan: it markets itself as "the world's leading music company" and as the corporate parent of Motown Records, it distributes and sells its music throughout the State of Michigan, including in this District.

13.     This lawsuit arises out of Defendant UMG's contacts with the state of Michigan.  Defendant UMG's excuse for invoking the royalty-withholding provision is the Worrell lawsuit, which was filed and litigated in this District.  A significant number of the sound recordings at issue and that gave rise to the withheld royalties were created within this District.

14.     UMG has consented to the jurisdiction of this Court.  In the related Worrell Litigation, UMG was dismissed as a defendant without prejudice but voluntarily entered into a stipulation (later withdrawn and substituted with another stipulated dismissal) consenting to engage in certain conduct subject to ongoing monitoring by this Court for the duration of the Worrell Litigation.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred here: (a) UMG claims

5

to be withholding royalties based on a dispute litigated in the Eastern District of Michigan; (b) a significant portion of the sound recordings at issue were created in Detroit, Michigan; and (c) UMG's communications and conduct relating to the legal hold have been directed at Plaintiff's Michigan counsel in this District over a period of more than two years.

## FACTUAL ALLEGATIONS

### A. The Governing Agreements

16.     UMG (through its predecessors and affiliates) has entered into various agreements with Clinton and his related entities governing the exploitation of sound recordings performed by Clinton.

17.     On October 23, 1980, P-Funk, Inc. and Casablanca entered into an Artist's Production Agreement (the "1980 Agreement") governing the recording and production services of Clinton, performing professionally as "Parliament."

18.     UMG is the successor-in-interest to Casablanca under the 1980 Agreement.

19.     The 1980 Agreement provides for the payment of royalties to Clinton derived from the exploitation of recordings made thereunder.

20.     Paragraph 15 of the 1980 Agreement contains a limited indemnification and royalty-withholding provision. The first sentence of paragraph 15 establishes the trigger for indemnification:

Producer agrees to indemnify and hold Company … harmless against all claims … in connection with any claim by a third party, reduced to judgment or settled with Producer's written consent, arising out of or occasioned by any breach or alleged breach of … any agreement, covenant, representation, warranty or grant made by Producer and/or Artist hereunder ….

21.     Indemnification under paragraph 15 is therefore tied to ***actual liability***: it requires a third-party claim to have been "reduced to judgment or settled with Producer's written consent," and limits reimbursement to amounts "pa[id] by Company" in respect of such liability.

22.     Paragraph 15 also contains a related, but narrow, withholding provision:

Upon the making or filing of any such claim, action or demand, Company shall be entitled to withhold from any amounts payable under this Agreement or under any other agreement between Company and Producer (or any of their respective affiliated or related entities) such amounts as may be reasonably necessary, in Company's judgment, to protect Company and as are related to the potential liability in issue.

23.     UMG has based its sweeping legal hold on Paragraph 15 of the 1980 Agreement.

24.     By its plain terms, Paragraph 15 authorizes withholding only of amounts (i) "reasonably necessary" (ii) "to protect [UMG]" (iii) and "related to the potential liability in issue."

25.     Thus, UMG's discretion under the provision is constrained by an express reasonableness standard. Under California law, which governs the 1980

7

Agreement, that discretion is further constrained by the implied covenant of good faith and fair dealing.

26.     Subsequent to the 1980 Agreement, UMG (through its predecessors) entered into various agreements with Clinton (and his related entities), including a 1981 Exclusive Artist's Recording Agreement, a 1984 Artist Royalty Agreement, a 1986 Artist Agreement, a 1996 License Agreement, a 1996 Production Agreement, and a 1996 Remixer Agreement. Each of these agreements provides for the payment of royalties arising from the exploitation of Clinton's work. The royalties are spread across multiple accounts, the majority of which identify Clinton as the individual owner and payee.

### B. The Worrell Litigation Cannot Subject UMG to any Liability

27.     The Worrell Litigation cannot give rise to any "potential liability" for UMG, for at least three independent reasons.

28.     **First**, UMG is not a party to the Worrell Litigation and cannot be held liable in it.

29.     UMG was named in the Estate's May 2022 complaint only "in an abundance of caution," and was dismissed without prejudice by stipulated order on October 20, 2023. The Estate has not since reasserted any claim against UMG. No demand for payment has been made against UMG. No judgment can be entered against UMG in a case in which it is not a defendant.

8

30. Indemnification under paragraph 15 of the 1980 Agreement is triggered only by a claim "reduced to judgment or settled with Producer's written consent"; neither has occurred, and neither can occur, because UMG is not a party.

31. **Second**, even in the highly unlikely event the Estate were to prevail against Clinton on fifty-year-old copyright ownership claims, UMG would face no liability.

32. The only relief the Estate has ever sought is a *declaration* of 50% co-ownership of certain sound recordings, and an accounting from Clinton.

33. Specifically, the Estate has claimed that it is entitled a declaratory judgment that it "holds an equal share, along with Mr. Clinton" in the specific sound recordings, and that share "should mean 50 percent."

34. If the Estate were ever to obtain such a declaration, the legal consequence would be that *Clinton* would be required to account to the Estate for its share of royalties Clinton had received. The Estate has no claim against UMG for those royalties, and no legal mechanism exists by which UMG could be required to pay the Estate. UMG, as a non-party, would have no liability or obligation to the Estate.

35. As the Estate itself acknowledged in the stipulated order originally entered in the Worrell Litigation dismissing UMG, the Estate "will not seek any

remedy or relief against" UMG or the other now-dismissed music company defendants.

36. Likewise, the original stipulated order stated that UMG "shall not be bound by any order or judgment issued in" the Worrell Litigation that "would adversely affect" UMG's "claims of authorship, ownership, or control" of the sound recordings at issue.

37. **Third**, the Estate's entire case rests on a putative 1976 "Agreement" that has been adjudicated unenforceable and that, even on its face, is temporally narrow. The Estate's sole argument that its decades-old claims are timely is its reliance on an unsigned document dated January 1, 1976 (the "1976 'Agreement'").

38. There is no plausible claim of co-ownership of any recording made *before* 1976. The 1976 "Agreement" applies only prospectively. As the District Court correctly observed in granting summary judgment, the Estate's legal theory "does not plausibly account" for recordings created from 1969 through 1975.

39. There is also no plausible claim of co-ownership of any recording made *after* 1976. The 1976 "Agreement", by its express terms, was for "a period of one (1) year commencing on the date hereof," with optional one-year renewals exercisable only at Thang's discretion. There is no evidence that the option was ever exercised and no evidence of any renewal.

40.     In sum, the Estate's most aggressive theory of recovery in the Worrell Litigation is necessarily limited to a 50% co-ownership interest in recordings made during a single calendar year (1976), under a putative agreement that has been declared unenforceable. Yet UMG is withholding 100% of royalties from every Clinton account spanning the entirety of Clinton's recording career, both before and after 1976.

41.     The Estate has appealed the summary judgment ruling; but regardless of the outcome of the appeal, no judgment can run against UMG, which is not a party to either the District Court action or the appeal.

### C.  UMG's Withholding is Untethered To Any Conceivable "Potential Liability"

42.     Notwithstanding the foregoing, UMG has frozen **100%** of royalties otherwise payable to Plaintiff across every Clinton-related royalty account for more than three years.

43.     By way of example, as of the quarterly statements for the period ended December 31, 2025: Royalty account No. 20106304 ("PARLIAMENT") shows a payee amount due of **$996,123.03**; Royalty account No. 95603068 ("CLINTON, GEORGE/CLIJO PROD") shows a payee amount due in excess of **$99,000**; and Royalty account No. 95601068 ("RED HOT CHILI/GEORGE CLINTON") shows a net payee amount due of **$29,543.22**.

44.     By letter dated September 15, 2025, Plaintiff's counsel identified at least twelve (12) separate Clinton-related royalty accounts subject to the legal hold, spanning multiple UMG labels (Mercury/Island, Capitol, and others). These accounts include royalties generated from sound recordings that have no factual or legal nexus to Bernie Worrell, to Parliament, or to the 1980 Agreement.

45.     For example, UMG has frozen tens of thousands of dollars in royalties generated from Clinton's independent production work for the rock band the Red Hot Chili Peppers. The Estate has never claimed any interest in those recordings, which were created decades after Bernie Worrell's involvement with Parliament, on a different label, with different artists, and under a different contract.

46.     UMG's blanket freeze across every Clinton-related account in its administration is not authorized by the 1980 Agreement or any other contract with Clinton.

47.     Plaintiff has repeatedly demanded that UMG release the withheld royalties in numerous communications between December 2023 and March 2026.

48.     UMG has delayed, equivocated, and provided misleading assertions that it was "considering" releasing a portion of the withheld royalties.

49.     UMG has offered no substantive response beyond speculation about hypothetical, unpled, unasserted, and contractually foreclosed future claims; none of

which are a basis to withhold royalties under Paragraph 15 or any other operative agreement.

50.     Paragraph 15 authorizes withholding only of amounts "reasonably necessary" to protect UMG; UMG has not articulated any reasonable basis to withhold the full amount of royalties payable across all Clinton accounts.

51.     Paragraph 15 ties withholding to the "potential liability in issue"; however, UMG faces no potential liability in the Worrell Litigation because it is not a party.

52.     Paragraph 15 does not authorize a pre-judgment attachment of Plaintiff's royalties. The first sentence of Paragraph 15 makes clear that the indemnification obligation arises only when a third-party claim has been "reduced to judgment or settled." Neither has occurred and no judgment could attach to UMG because it is not a party to the Worrell Litigation.

53.     UMG has ignored the temporal and quantitative limits of any conceivable claim by the Estate, and it has imposed a freeze that vastly exceeds the maximum exposure under the Estate's own most aggressive theory.

### D. Resulting Harm

54.     UMG's conduct has deprived Clinton of substantial royalty income to which he is contractually entitled. These royalties are Plaintiff's primary source of income.

55. UMG's unauthorized sweeping legal hold has caused severe financial harm to Clinton personally and to his ability to conduct his business.

## COUNT I – BREACH OF CONTRACT

56. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

57. UMG had contractual obligations to pay royalties to Plaintiff.

58. UMG breached those obligations by withholding 100% of royalties without contractual justification.

59. UMG's conduct exceeds any permissible withholding under the indemnification provision, which is triggered only by actual liability, and is limited by a reasonableness standard.

60. UMG's withholding is not "reasonably necessary"; is not necessary to "protect" UMG against any actual or potential liability; and is not "related to the potential liability in issue" because no potential liability exists.

61. UMG's withholding is disproportionate, unsupported by any adjudicated claim, and inconsistent with the agreements.

62. As a direct result of UMG's breaches, Plaintiff has suffered damages in an amount to be proven at trial, but in any event substantially in excess of $1.1 million, plus interest, costs, and consequential damages.

63.     The governing agreement also contains a fee-shifting provision entitling the prevailing party to recover attorneys' fees.  Plaintiff is entitled to recover his reasonable attorneys' fees and costs incurred in this action.

**COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

64.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

65.     The parties' contracts governed by California law, including the 1980 Agreement, include an implied covenant of good faith and fair dealing.

66.     The covenant applies with particular force where, as here, one party is given a discretionary power affecting the rights of the other party.

67.     UMG has breached the implied covenant of good faith and fair dealing by exercising its discretion in a manner that is arbitrary, unreasonable, and inconsistent with the purposes of the parties' agreement, including by: (i) withholding 100% of the royalties when the Estate's claim could never reach that amount; (ii) withholding royalties that have no connection to the sound recordings in dispute; (iii) continuing to withhold royalties for years after UMG was dismissed from the Worrell Litigation; (iv) continuing to withhold royalties after the District Court granted summary judgment in Clinton's favor and found that the Estate had no plausible theory to recover on the majority of sound recordings at issue; (v) invoking hypothetical and legally foreclosed potential claims as a basis for

withholding when in fact no judgment could attach to UMG and the Estate previously represented that it would not seek any relief against UMG; and (vi) delaying and equivocating in response to Plaintiff's repeated good-faith demands for release of the withheld funds, in effect perpetuating a pre-judgment attachment of Plaintiff's royalties for nearly three years.

68. As a direct and proximate result of UMG's breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages in an amount to be proven at trial.

### COUNT III – ACCOUNTING

69. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

70. UMG owes Plaintiff a duty under the 1980 Agreement, as well as under all other operative contracts that provide for the payment of royalties, and under the implied covenant of good faith and fair dealing, to render true, accurate, and complete royalty accountings, and to timely pay royalties due thereunder.

71. The 1980 Agreement also expressly provides for the mutual availability of all equitable remedies to redress a contractual breach.

72. The relationship between Plaintiff and UMG is of a continuing nature and involves the administration of royalties across multiple labels and catalogs, the application of multiple operative agreements, and the payment of royalties through

at least twelve (12) separate royalty accounts subject to the legal hold, with independent contractual provisions, royalty terms, and audit histories.

73.     The information necessary to determine the precise amounts owed to Plaintiff – including without limitation: (a) the gross earnings credited to each account during the period of the legal hold; (b) the deductions, reserves, recoupments, rates, and withholdings applied to each account; (c) the operative contract codes and royalty rates applied to each line item; (d) the allocation of earnings; (e) the application of any escalations, account transfers, or balance forwards; (f) the identity and amount of any royalties paid or credited to third parties from accounts otherwise payable to Plaintiff; and (g) the methodology by which UMG determined the amount subject to the legal hold – is exclusively within UMG's possession, custody, and control.

74.     The accounts are so numerous and so complex, and the operative agreements and royalty methodologies so varied across the affected accounts, that it would be impracticable for Plaintiff to conduct separate, individualized accountings of each account in order to demand a fixed sum at law. Plaintiff therefore lacks an adequate remedy at law for the determination of the precise amounts due.

75.     Plaintiff is entitled to an equitable accounting requiring UMG to render a true, complete, and verified accounting of (a) all royalties accrued, earned, credited, deducted, recouped, reserved, withheld, paid, or otherwise allocated in each

Clinton-related royalty account subject to the legal hold; (b) the period from the inception of the legal hold to the date of final accounting; (c) the contractual basis asserted by UMG for each item of withholding; and (d) the sums due and payable to Plaintiff as a result.

76. Plaintiff is further entitled to pre-judgment interest on all sums determined to be due, at the maximum rate permitted by applicable law, running from the date each withheld payment was originally due to Plaintiff under the operative royalty schedule.

77. In the alternative, or in addition to statutory or common law interest, Clinton seeks to have UMG account for how it invested the funds at issue and for UMG to disgorge any and all earnings accrued on the wrongfully withheld funds.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant UMG Recordings, Inc., and grant the following relief:

a. Compensatory damages for breach of contract and breach of the implied covenant of good faith and fair dealing, in an amount to be proven at trial but substantially in excess of $1.1 million, together with pre-judgment and post-judgment interest at the maximum rate allowed by law;

b. An order requiring UMG to release all withheld royalties to Plaintiff;

18

c.   A true, complete, and verified accounting of (a) all royalties accrued, earned, credited, deducted, recouped, reserved, withheld, paid, or otherwise allocated in each Clinton-related royalty account subject to the legal hold; (b) the period from the inception of the legal hold to the date of final accounting; (c) the contractual basis asserted by UMG for each item of withholding; and (d) the sums due and payable to Plaintiff as a result;

d.   An injunction prohibiting UMG from continuing to withhold royalties;

e.   An award of pre-judgment interest on all sums determined to be due, at the maximum rate permitted by applicable law, running from the date each withheld payment was originally due to Plaintiff under the operative royalty schedule;

f.   An order requiring UMG to account for how it invested the funds at issue and for UMG to disgorge any and all earnings accrued on the wrongfully withheld funds;

g.   Attorneys' fees and costs; and

h.   Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

19

Dated: May 15, 2026

Respectfully submitted,

SCHENK & BRUETSCH PLC
By: /s/ James P. Allen
James P. Allen, Sr. (P52885)
Peter E. Doyle (P81815)
211 W. Fort Street, Suite 1410
Detroit, MI 48226
(313) 774-1000
james.allen@sbdetroit.com
peter.doyle@sbdetroit.com

THE SCHARF APPELLATE GROUP
Erik W. Scharf
1395 Brickell Ave., Ste. 800
Miami, FL 33131
(786) 382-7611
erik@appealsgroup.com

*Attorneys for Plaintiffs*